UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WISCONSIN

---

In re:  Case No.: 17-10305-13

SUSAN M. ROWE,

    Debtor.

---

SUSAN M. ROWE,

    Plaintiff,
v.  Adversary No.: 17-17

J. DAVID KREKELER and
MARY KREKELER,

    Defendants.

---

## **DECISION**

Susan Rowe ("Rowe" or "Plaintiff") filed a chapter 13 petition in February 2017. A month later, she filed this adversary proceeding seeking to avoid a lien on her residence. David and Mary Krekeler ("Defendants") answered arguing the lien is not avoidable.

Plaintiff, Defendant David Krekeler, and two certified residential appraisers were witnesses at an evidentiary hearing.

## **FACTS**

The parties agree Rowe owns a home at 1037 Ridgewood Way, Madison, Wisconsin (the "Property"). Oregon Community Bank holds a first mortgage (the "First Mortgage"). It is also subject to Defendants' second mortgage (the "Second Mortgage"). The Plaintiff owes $82,191.00 on the First Mortgage.

Rowe signed the Second Mortgage to provide additional collateral securing obligations of Jennifer Davis and Jovan Montgomery ("Davis") to the Defendants. She admits signing the Second Mortgage as security. She argues she did not realize the Property would be liable for the entire indebtedness if Davis breached. She claims she thought she would only be liable for $15,000. Davis did breach. The primary security for the Davis indebtedness was sold at a foreclosure sale. Thereafter, a deficiency judgment ("Judgment") in the amount of $163,977.26 was entered.

Rowe received a chapter 7 discharge within the last four years and is not eligible to receive a discharge in this bankruptcy.

## DISCUSSION

Plaintiff posits the Second Mortgage is wholly unsecured, and therefore under section 1322(b)(2), the lien may be stripped off upon completion of the Plan. The Defendants respond that Rowe has undervalued the Property and their lien is partially secured. As a result, Defendants argue the Second Mortgage is not avoidable under section 506(d) and the Plaintiff should not be able to strip the lien.

Rowe's Plan was confirmed on March 27, 2017. Defendants did not object to the Plan.

### I. Plan Confirmation

Plaintiff's Plan provides that the Defendants' lien is avoided. Plaintiff argues that language controls. Defendants respond that because there is equity

for their mortgage and the lien strip issue was joined pre-confirmation, the confirmation of the Plan does not control.

Courts have held due process trumps the "finality" of a plan. *SLW Capital, LLC v. Mansaray-Ruffin (In re Mansaray-Ruffin)*, 530 F.3d 230, 238 (3d Cir. 2008) (citing *Piedmont Trust Bank v. Linkous (In re Linkous)*, 990 F.2d 160, 162 (4th Cir. 1993)). Reasoning that creditors have a right to the added procedural safeguards of an adversary proceeding before their lien is eliminated, courts have found a creditor "is ordinarily not bound by an attempted elimination of its lien for some reason other than lack of collateral value, unless actually litigated." *In re Zimmerman*, 276 B.R. 598, 602 (Bankr. C.D. Ill. 2001). A court may nonetheless bind a creditor to plan valuation for purposes of distribution. *Id*.

The Plan states the amount of the Defendants' claim is $0.00. It does not, however, state a value for the Property. Under *Zimmerman,* the valuation issue was not litigated as part of a plan confirmation. Thus, there is no valuation of collateral in the Plan to which Defendants might be bound.

Moreover, it would be an odd result for the Court to rule that because the Defendants did not object to the Plan, they are precluded from asserting their rights in the lien now. Plaintiff filed this adversary proceeding and the Defendants filed an answer three days before the Plan was confirmed. While Defendants had not objected to the Plan, they had nonetheless filed a pleading in the adversary that denied the mortgage was avoidable and affirmatively stated "there is equity for the Defendants' mortgage to attach." Although the

3

confirmed Plan may bind Defendants with regard to distributions under the Plan, it is not dispositive of the issue of lien stripping in this case.

Defendants have an important interest in the lien. The Defendants asserted their rights in the Property before confirmation of the Plan. Defendants did not simply sit on the sidelines. Neither did Plaintiff ignore the issue. Plaintiff recognized that action in addition to the Plan was required to lien strip and so filed an adversary proceeding. Defendants' due process rights take priority over a term in the Plan. Rowe's attempt to avoid the lien in the Plan is not binding absent a specific determination in a separate contested case or adversary proceeding. The confirmed Plan merely means no payments will be made to Defendants through the Plan.

**II. Valuation of Real Estate and Lien Strip**

Bankruptcy Rule 3012 provides "[t]he court may determine the value of a claim secured by a lien on property in which the estate has an interest on motion of any party in interest and after a hearing on notice to the holder of the secured claim and any other entity as the court may direct."

For purposes of stripping off a junior lien as part of an adversary proceeding in chapter 13, property is valued as of the petition date. *Marsh v. United States Dep't of Hous. & Urban Dev. (In re Marsh)*, 929 F. Supp. 2d 852, 858 (N.D. Ill. 2013); *see also Briseno v. Mut. Fed. Sav. & Loan Ass'n (In re Briseno)*, 496 B.R. 509, 515 (Bankr. N.D. Ill. 2013); *Brendan Mortg., Inc. v. Hall*, No. 13 CV 5870, 2014 WL 4414508, at *3 (N.D. Ill. Sept. 5, 2014). The court

will take into account the time between the petition date and an appraisal when assessing the accuracy of the appraisals and testimony.

Real estate that is being retained for a debtor's use is valued at the replacement value of the property. *In re Bell*, 304 B.R. 878, 880 (Bankr. N.D. Ind. 2003) (citing *Assocs. Commercial Corp. v. Rash*, 520 U.S. 953, 960 (1997)); *In re Watkins*, 240 B.R. 735, 741 (Bankr. C.D. Ill. 1999). "Replacement value is equivalent to fair market value, or the value a willing purchaser in the debtor's business would pay for a like property." *Id.*

Replacement value can be arrived at by any or a combination of three recognized methodologies: (1) the cost approach; (2) the sales comparison approach; and (3) the income approach. *See In re Old Colony, LLC*, 476 B.R. 1, 11-12 (Bankr. D. Mass. 2012). Ultimately, the touchstone of the valuation process is the market price of comparable properties. *See Rash*, 520 U.S. at 964; *In re Bell*, 304 B.R. at 881.

Rowe will retain the Property. The appropriate valuation method is the sales comparison approach.

The parties have filed several conflicting valuations for the Property. The Schedules value the property at $68,000. Plaintiff's appraiser places the value at $72,000. Defendants' appraiser submitted two appraisals valuing the Property between $90,000 and $100,000.

None of the valuations are dated precisely on the petition date. Therefore, under *Marsh*, none would provide an exact valuation at the relevant time. All use the sales comparison approach.

The Mickelson appraisal uses comparable properties within .68 miles, while the Roessler appraisals use properties within .28 miles. While both of those are within a reasonable distance from the Property, the Roessler appraisals may be somewhat more accurate from a proximity and general location point of view.

In weighing conflicting appraisals and in light of the "subjective nature of the appraisal process, courts are given wide latitude in determining value." *Patterson v. LJR Invs., LLC (In re Patterson)*, 375 B.R. 135, 144 (Bankr. E.D. Pa. 2007). A court is not bound by the number in an appraisal and "may form its own opinion as to the value of the subject property after consideration of the appraisers' testimony and their appraisals." *Karakas v. Bank of N.Y. (In re Karakas)*, 2007 WL 1307906, at *6-7 (Bankr. N.D.N.Y. May 3, 2007).

Mickelson substantially discounts the value because of what he indicates he believes is mold in the basement and the age of the property, including its roof. However, his appraisal describes the condition of the property as "fair to average" with no "physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property." An addendum does note a bad roof, deterioration of paint and the garage door, basement leaks, and mold issues. His comparables were selected for proximity, age, and quality. No other specific comments about their condition were detailed.

Roessler viewed the interior of the property about five months before the bankruptcy in connection with his first appraisal. He noted some damage in the lower level due to water seepage. He also noted the roof, gutters, and soffits

6

were near or at the end of their useful lives. These deficiencies were also reflected in his updated appraisal and he noted the "home shows more deferred maintenance than the majority of homes in the area." Roessler also selected comparables taking into account proximity and condition. His report provides some description of conditions of comparables. For example, he states Comparable No. 1 is "similar in overall condition to the subject property [and] needs work and updating." There was some deferred maintenance for Comparable No. 2, and Comparable No. 3 had recent improvements, including a new roof. Both appraisers viewed the interior of the Property—Mickelson in July 2017 and Roessler in September 2016.

Rowe argues the second Roessler appraisal is inaccurate because Roessler did not personally view the inside of the Property for that appraisal. His second appraisal assumed the interior had not significantly changed since September 2016. This assumption was confirmed by Plaintiff. She testified the interior of the Property had not changed significantly between September 2016 and October 2017. Thus, this criticism fails.

There may be mold in the basement of the Property. The pictures presented at trial show some staining and discoloration on a wall. The photos also show what appears to be some sort of dark marks or paint on a basement wall. Mold can affect the livability and value of property. The price offered would likely take into account any such defect and the need for remediation. Roessler testified he took that into consideration when making his appraisal. Mickelson discounted the value substantially and thus maintains the price

would be depressed. There was no expert testimony confirming the presence of mold, but both appraisers considered the concern in their valuations.

The age of the property, deferred maintenance, and location near train tracks are all factors that affect the value of the Property. Neither appraisal is perfect. Roessler used comparable sales that were geographically closer to the Property than those used by Mickelson. His appraisals more accurately take into account the neighborhood and proximity to the train tracks, and more clearly articulated grounds for the adjustments based on comparables. He also took into account substantial deferred maintenance and assigned no value to the lower level because of its condition.

Both appraisals use as a comparable a sale of a residence at 920 Burr Oak Lane for $90,000. Roessler confirmed that property needed work and adjusted that amount to $93,000 based on the Property's garage and overall square footage. Mickelson's appraisal adjusted down to $79,596 based on square footage and on the condition of the Property. This latter factor was the greatest adjustment despite the fact he characterized its condition as "average" while he called the Property condition "fair to average." Mickelson failed to make any adjustment for finished rooms below grade in this comparable—apparently because he overlooked the fact it had 720 square feet finished in the basement. He also ignored some recent updates.

If averaged, the Roessler appraisals equal out to $95,000. Because the 2016 Roessler appraisal was five months before the petition date and the 2017

Roessler appraisal was eight months after, using the average of the two may more accurately reflect the value as of the date of filing.

Each appraisal has strengths and weaknesses. The credibility of the appraisers and their credentials are also factors to weigh in reaching a valuation. Mickelson has been a Certified Residential Appraiser for 14 years. Roessler has been a Certified Residential Appraiser since 1986. He is also a licensed real estate broker. Mickelson is critical of Roessler because he is a licensed broker. He contends this creates a conflict of some sort. He theorizes that realtors simply want commissions while appraisers use "real facts." This argument is not persuasive in this case. Roessler wasn't hired as a realtor. He will receive no commission. On the other hand, his experience as a realtor enhances his knowledge of "real facts" by making him aware on a day-to-day basis of market conditions and sales. He testified he regularly performs market analyses as a realtor. That affords him the chance to actually view many homes, thus enabling him to see what does or does not sell.

An average of the two Roessler appraisals is $95,000. An average of that value and the $72,000 value claimed by the Plaintiff is $83,500. Under the facts of this case, that is a fair and reasonable value for the Property. As a result, Defendants hold a secured claim in the amount of at least $1,309.

Mickelson argued that averaging values was inappropriate and the Court should be bound to select one of the appraisals. If this Court were to do so, the Roessler valuations are more persuasive and his testimony was more credible. He acknowledged issues with the basement and so gave no value to that square

footage. He considered that the roof, gutters, and soffits were at their useful lives. He also considered other deferred maintenance. He made appropriate adjustments to the comparables. He was more forthcoming in explaining the bases for his adjustments. He applied actual market experience as well.

On the other hand, much of Mickelson's opinions were, in significant part, incredible. Rather than focusing on detail regarding the comparables, he principally based opinions on matters outside his expertise. He is not an environmental engineer or certified home inspector. He stated, without any foundation, there was mold. He further pronounced that, in his opinion, that would mean no buyer could obtain conventional financing. This opinion was without foundation and contrary to the experience of this Court. While the existence of mold can affect terms and conditions for financing, it is not an absolute bar. Mickelson also failed to explain his adjustments to comparables other than in very general terms. His value was also suspiciously close to the Plaintiff's opinion of value of $70,000 (based on a foreclosure sale). He concluded a liquidation or a foreclosure sale were the only real comparables, despite the fact that the applicable standard is fair market value.

Having found that Plaintiff's claim is partially secured, the Plaintiff's property is security for the entirety of the Second Mortgage. Under section 1322(b)(2), a chapter 13 plan may modify the rights of secured claim holders, "other than a claim secured only by a security interest in real property that is the debtor's principal residence." The Supreme Court has held that section 1322 "[refers] to the lienholder's entire claim, including both the secured and

unsecured components of the claim." *Nobelman v. American Sav. Bank,* 508 U.S. 324, 331 (1993). Under *Nobelman's* interpretation of the Code, a chapter 13 plan may not modify the rights of a creditor whose claim is secured in any part by a debtor's home.

Applying *Nobelman,* the lien is security for the entire Second Mortgage because some of the claim is secured. *See also In re Etchin,* 128 B.R. 662, 665 (Bankr. W.D. Wis. 1991); *In re Duncan,* No. 08-8808AJM3, 2008 WL 5333561, at *1 (Bankr. S.D. Ind. Dec. 17, 2008). The anti-modification provision in section 1322 prevents the Plaintiff from changing Defendants' rights.

## CONCLUSION

Defendants' claim was partially secured on the petition date. Thus, the mortgage is not avoidable. Because the Court concludes the Defendants' claim was partially secured, the Court need not address the issue of whether a chapter 20 debtor may strip off a wholly unsecured lien.

This decision shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

A separate order consistent with this decision will be entered.

Dated: January 23, 2018

BY THE COURT:

_____
Hon. Catherine J. Furay
U.S. Bankruptcy Judge